We next will hear Hallum v. Sheriff of Delaware County, number 245012. Counsel, you may proceed. Good morning, Bob Blakemore for the plaintiff. This is a excessive use of force case that occurred beginning the relevant 9th, 2019, going into the early morning of March 30th. Mr. Hallum was a local business owner in Delaware County. That night he went to his place of business there, Higher Health, and he'd been distraught about some events earlier, personal events earlier that day, ended up setting off the burglary alarm and then went out to his car in the parking lot of the business and fell asleep in the passenger side of the So a little bit after midnight, two deputies from Delaware County, one is Deputy Williams, the other one, Deputy Beck, and then one police officer from Bernice Police Department, Officer Trout, arrive, they see. Counsel, can I stop you for a moment? Just right there. So for purposes of the first gram factor, we need to know what the crime at issue was, and it seems that you're contesting that there was no crime here at all. There was no reason to suspect Mr. Hallum of any crime. Weren't the officers responding to a commercial burglary call? And if so, if that's what the record shows, why wouldn't that satisfy the first gram factor in support of Deputy Williams? Well, if you look at, for instance, Priya versus Baca, whether the suspect or subject is suspected of committing a serious crime, they were investigating and they were called out because of the burglar alarm, but they had no reason to believe that Mr. Hallum committed any crime at the time of the use of force. And actually, if you look at Deputy Williams' probable cause affidavit, and that's the pertinent pages you'll find at Appellant Appendix 289 and 290, he doesn't articulate any crime that he suspected Mr. Hallum of committing. And then Officer Trout, admittedly, pretty early after seeing Mr. Hallum in the vehicle, identified him as the property owner. Did Deputy Williams also know the identity? He denies that he did. Did you contest that in the district court? We did. Just so circumstantially, when they arrive, there's like 30 seconds after Trout, they'd seen him in the car, there's 37 second conversation that we can't hear, and our argument is, is that it would be reasonable to infer that Trout would have told Deputy Williams prior to him going into the building that this is the, I know this guy, this is the property owner. Officer Trout says he did in his affidavit, right? He does. So, and Officer Williams says he didn't also. Correct. Does the video shed any light on that? Only the fact that, again, there was this, after they'd arrived there and after, I think that Trout would concede that he identified Mr. Hallum as the, as the property owner and the business owner, that they had this conversation for around 37 seconds. And again, the argument is it would be reasonable to infer that he told him. But I don't think it, I think under the facts, whether Williams knew that or not is not, is not dispositive, because again, when you look at his probable cause affidavit, he doesn't articulate any crime that he suspected Mr. Hallum of committing at the time that he, that he took him to the ground. Well, he, he does say that he thought that the other officer was in danger. So another crime that he could have thought was occurring was assault on a police officer. He does, he doesn't identify that as a crime. He does say that in the probable cause affidavit that he wanted to get control over the situation. The question is whether... Does he need to articulate that? Is, aren't we, wouldn't we evaluate that under what a reasonable officer would think was going on there between Officer Trout and Mr. Hallum? Yes, sir. It would be, it would be a question of, was it reasonable? I mean, it actually goes to one of the core of the case. Was it reasonable for Deputy Williams to believe under the circumstances that, that Mr. Hallum posed any kind of threat of harm to Officer Trout? And we say no. When you look at the, the video, the surveillance video, he approaches from the backside of, of the, Mr. Hallum's vehicle, Mr. Hallum had had his arms out. He's clearly unarmed. He never... But he's walking towards the officer. He walks forward, gets pushed back and he comes back again. He makes one, he makes, yes, yes, sir. He makes one step with his hands like this, gets pushed. They're kind of like, they're out front a little bit. I, I, I view them as being more to the side. He's, he's clearly unarmed. He never clenches his fist. I don't think he makes any kind of threatening move. But he is making a forward motion. You can see that in the video, right? Yes. And he's pushed back. He's being really cornered. I mean, it's our view that it's really Officer Trout that is, is being aggressive. He's, he's cornered in between Trout and his, in his vehicle. They're having this conversation. Mr. Hallum's testified he was respectful. He asked them to leave. Again, Trout knew that this was his, his place of business. And he does make the one step forward. He's pushed back against the car, steps forward again, then he's pushed back. And at the time that Williams arrives, immediately puts him on an arm bar and takes him down into the, onto the pavement and causes some significant injuries, including a concussion. And a fractured nose and under existing precedent, that's, that's unreasonable. And it's excessive. What is the existing precedent that you rely on for the clearly established component? The most, the most applicable case, because it involves a takedown, is Morris vs. Noe. And that case also involved an alleged disturbance, a house that had been ransacked, but actually in that case, the court gave credence to the idea that Mr. Morris was suspected of assault. And here there's no evidence again, that, that Mr. Hallam, there was any reason to think that he committed any crime, let alone a violent crime. But we're looking at it from the moment, we're looking at the use of force at the, at the moment, right? We have to identify the moment that the force was used, what was going on at that moment and in Morris, the plaintiff had his hands in the air and was walking backward toward the officers. I mean, the facts just seem at the moment force was used to be different than the facts here. And for you to satisfy your burden on clearly established, don't you need to have some more symmetry in the factual circumstances? Well, I mean, you're, you're never going to find a case, or rarely, we find a case that's factually identical. Right. And I agree with that, but I mean, aren't the relevant, the relevant facts, the dispositive facts different enough that Morris is not a particularly supportive case for you? No, I don't, I don't think so. I actually think that Morris, the situation in Morris was more, was more potentially dangerous. You have this Quentin Bell individual. There's a verbal altercation between Mr. Morris and Quentin Bell, and then Bell starts approaching Mr. Morris in an aggressive, an aggressive manner. There was a reasonably that some kind of fight was about to, was about to occur. And, and Mr. Morris tries to deescalate by putting his hands up in the air, not like this, up in the air, and walking backwards away from the aggressor. Right. Right. That's the dispositive fact, isn't it? Well, I think it's, again, that in both situations, hands out, unarmed, not posing any immediate threat, and then you have a, a takedown, a forceful takedown in both cases. Deputy Williams, I think it's in his brief, one of the, one of the appellate briefs, says that the closer case here is Gallegos versus City of Colorado Springs. Right. Why isn't that correct? Well, so Gallego, in that case, when the, the force is used, you actually have the suspect, first, he's grabbed by his shoulder, he jerks away, and then the way it's described, he turns around with his fists clenched in a, quote, wrestler's position. There's nothing approaching that in this case. I mean, again, we have Mr. Hallam never clenched his fist, never threatened anyone, and never got, got down into any kind of provocative position, like a wrestling position, never jerked away. And so I think that there, I think that Morris is, is, is more factually similar. Just briefly with respect to the, the district court's order, one of the other issues is the third factor under Graham versus Connor. The district court found it was inapplicable because Mr. Hallam was actually not being placed under arrest. I think that that's based on Polly versus White, that that's erroneous as a matter of law, and the third factor should have weighed in, in heavily in our favor. Under our case law, doesn't the failure to obey commands cut against the plaintiff on the third Graham factor? On the third Graham factor? I, it, so the question under the third Graham factor is whether there was active resistance. Right. But we have case law that says that if the plaintiff was given instructions and not following them, that weighs against the plaintiff in the analysis in the third factor. I, I'm still not clear what, based on the record, what command it was. Well, he came forward and he was pushed back once and he didn't stay back. He came forward again. So Officer Williams, who sees that, whether he reasonably would have interpreted that as him refusing to follow instructions to back off. Um, I, I still believe that, uh, he's at most, uh, that's at most passive resistance and passive resistance alone is not, um, is not grounds to escalate force to, to the extent that you're, you know, slamming someone down on the, on the pavement. Um, and I see that I've got 10 seconds left. Does anyone have any other questions or, thank you. Thank you counsel. Your honors, may it please the court. My name is John Kim. I'm counsel for defendant appellee Ronald Williams in this appeal. I don't want to belabor the facts. Could you speak up a little bit? I'm sorry to interrupt you. Sure, your honor. Apologize. Uh, again, I'm counsel for defendant appellee Ronald Williams. I don't want to belabor the facts as you're well aware from the briefs now, and there's surveillance video that captured the entire incident. But as this is a case of qualified immunity, there are some key facts that I feel like bears underscoring. It's a late night commercial burglary alarm. Delaware County Sheriff's deputy Ronald Williams and Thomas Beck were dispatched. They arrived at a scene that was consistent with a commercial burglary. I believe Williams looked through the front window of higher health and he saw broken products on the ground, glass, marijuana plants thrown about. The scene looked consistent with a burglary. Shortly around their arrival, Bernice police officer Jerry Trout arrives and Williams asked Trout and Beck to stay behind with this man as he goes and investigates further. He goes to the back of the building. The back door, while locked, was, had been pried open. Again, consistent with a burglary. He goes inside. The scene is consistent yet again with a burglary. There's broken products on the ground. Speakers have been ripped off the wall, blaring music, cash strewn about on the floor. Williams goes around to the back of the front of the building, goes around to the front of the building and comes upon Officer Trout speaking to an unidentified man, and as he nears. Well, let me ask you about that. Yes, Your Honor. Unidentified man. We talked a little bit with Mr. Blakemore about this. And isn't, doesn't the record permit an inference or could a jury find that Officer Trout knew that Mr. Hallam owned the store and that he gave that information to Deputy Williams? Well, Your Honor, if I recall correctly from Trout's narrative, he doesn't ever state that he conveyed that information to Williams. And I'm asking if there can be an inference. If he stated he conveyed the information, we wouldn't even have to draw an inference. So I'm asking whether the record would permit an inference. For example, does the video show that the two of them talked, Trout and your client, before Deputy Williams went into the store? Your Honor, if that inference is drawn, I still don't think it changes the analysis under Graham, because if we take away the commercial burglary aspect of it, the surveillance video shows that. Well, no, I understand that. That, I think, should be your next point. But your first point should be either you agree there could be an inference or there couldn't be an inference. Your Honor, I presume an inference could be drawn. And what would you base that on? Well, I guess it would be the lack of evidence to suggest that that information was not conveyed, although the record on appeal does not show affirmatively that information was actually conveyed to Williams. But they spoke? They did speak, yes. And there's no audio until after he's handcuffed, right? Yes, Your Honor, that's correct. There's no audio in the surveillance video. So based on the evidence on the record on appeal, there's nothing to actually suggest that that information that this man was Mr. Hallam and the owner of Higher Health is supported in the record. But as going back to the facts, as Deputy Williams is rounding the corner. Could you answer Judge Matheson's, I guess, the second part of your answer to his question, if the inference is drawn, how does that change the analysis? Your Honor, I don't think it changes the analysis because as Williams is approaching, he sees this unidentified man, which we later know to be Mr. Hallam. Well, counsel, it changes that in the sense that it takes burglary off the table. Yes, Your Honor, I believe that leads into the fact that an assault occurred. I believe the surveillance video is clear that when this Officer Trout pushes Mr. Hallam back, he's sending a very clear message. It wasn't a light tap on the shoulder. He's very clearly demonstrating a message to Mr. Hallam to stay back. You're very close. Your opposing counsel sees it as Officer Trout engaging in the assaultive conduct and not Mr.  Yes, Your Honor, but as a law enforcement officer, I believe Officer Trout is entitled to secure the scene as they finish their investigation. And after Officer Trout sends this clear message and despite the clarity of this side, steps back within arm's reach of Officer Trout during the course of this criminal investigation. I think that weighs towards the second and most important grand factors, the immediacy of the threat. I believe when Williams sees this, he has to act quickly to secure the scene and the safety of all the officers on scene. And Mr. Hallam may characterize his hands out to the side as being compliant, but his hand was not above his head as normally one would show the compliance or behind his head. Can I just ask you, we have, I guess we have a step forward, push back, step forward, push back. So we have two of those. Does the record show that Deputy Williams witnessed both of those? Yes, Your Honor, you can see Deputy Williams rounding the corner as Officer Trout is executing the first push. And again, for purposes of qualified immunity, one asserted it's plaintiff's burden to identify a case where an officer acting under similar circumstances have been found to have violated the law. And Moore's first no is very distinguishable. As the court noted, Mr. Morris was unarmed, had never, never approached with an arm's reach of Mr. Quentin Bell, who is one of the individuals involved in the domestic disturbance, did not threaten him with words or gestures. And well, when Bell came towards him, Mr. Morris backed away with his hands up, with his back to the officers, retreating back towards the officers. That's in stark contrast to Mr. Hallam, where he had his hands up, which can reasonably be construed as inviting violence and steps positively towards Officer Trout, not once, but twice, even after he had been given a clear warning to stay back. Additionally, in Morris, the panel of this court had found that the records showed that the situation was, quote, calm and under control, whereas here in this appeal, there was nothing calm and under control until after the scene had been secured. Again, it's in stark contrast to Moore's first no. Well, with regard to how calm and under control it was, there's a dispute about whether, whether there was anger and screaming and stuff as opposed to a calm discussion. And again, we don't have any audio at that point. So don't we have to take the plaintiff's allegations there? Yes, Your Honor. If you solely rely on the surveillance video, as it does not have audio, but the record also has an audio recording after the subject use of force. Well, we do have that and we have the video of a banging head on the wall and all of that. But the critical moment is at the time force was applied. And we have the plaintiff saying, I was very calmly discussing it and there was no reason for this aggression by the officer. Yes, Your Honor. Even if we take out the audio component of that, if Mr. Hallam had never said any words, it doesn't change the fact his actions showed otherwise with his arms out, stepping towards an officer after being told clearly to step back and stay back. And not only that, he was within arm's reach of this officer, which in those circumstances, I can't imagine any situation where it's appropriate for an individual to come within arm's reach of an officer after being directed not to. As for purposes of the qualified immunity analysis, Mr. Hallam's opening brief also cites Dixon versus Richer and Casey versus City of Heights, both of which can also be distinguished from this case. In Dixon, unlike this appeal, Mr. Dixon was compliant with all orders. His hands were up against the van. He was unarmed. He had been frisked. Mr. Hallam had not been frisked. Mr. Dixon had complied with all orders from law enforcement officers. And in fact, the first initial investigating officer had actually kicked the instep of Mr. Dixon fairly hard, causing Mr. Dixon to turn around and curse at the officer and ask him if that was necessary. A panel of this court had actually determined that that first kick was reasonable under the circumstances and that him turning around and cursing at the officer could be considered an act of resistance. But afterwards, as additional officers arrived and they conversed amongst each other, for whatever reason, an officer again kicks Mr. Dixon, hits him with a flashlight. Choked and beat him after being frisked. Mr. Dixon wasn't making any aggressive moves. None of those facts were present in this underlying appeal. And as a court's probably very well familiar with Casey versus City of Federal Heights, Mr. Casey was just disputing or unsuccessfully disputing a traffic citation when he left the courthouse with a file that he wasn't supposed to take. After being accosted by an officer, Mr. Casey tried to hand the file back. The officer didn't take the file and for whatever reason, without giving commands, grabbed Mr. Casey. Another officer arrives on scene, tasers Mr. Casey. Yet more officers arrive on scene, take Mr. Casey down to the ground, bang his face into the ground and another officer drive stunts him with the taser. Again, none of those facts are remotely similar to what happens to Mr. Hallam on March 30th. Counsel, the district court thought that the third Graham factor wasn't relevant here. What is your position on whether the district court erred? Your Honor, for purposes of the Graham analysis, with the second factor being satisfied being the most important and the first factor also favoring Ronald Williams, I mean, the severity of the crime, I think regardless of whether the third factor applied or not, the ultimately the analysis still favors Ronald Williams. Doesn't that change if the severity of the crime, if it's not burglary, doesn't that change the analysis significantly? Yes, Your Honor. Would it be fair to assume that we can replace that with the assault committed on Officer Trout by Mr. Hallam? Well, what is your argument? That's I think that's your position, isn't it? Yes, it is, Your Honor. OK, so then you would say that the first two factors favor you and the third could be a It could be. But if we replace the first element of Graham with an assault, then I think the third factor then swings in favor of Williams because he's been told not to step within arm's reach and did so regardless of the warning. Your Honor, is there any other questions? Thank you, counsel. Thank you for your time. Thank you, Your Honors. Andy Artis for the sheriff. I had a brief conversation with Mr. Blakemore, who confirmed that they are not, they did not, as they did not put it in their brief, appealing the granting of the motion for summary judgment for the sheriff because it's a Monell claim and the judge found that there was no policy that would have caused an underlying violation. Of course, the judge found there was no underlying constitutional violation, but there was also no evidence of any policy that caused it in the brief by the plaintiffs. They don't address that very important issue and have conceded it. And then just talking to Mr. Blakemore, he confirmed that to me beforehand. So with that, I can answer any other questions you have. But I think that issue has been confessed here. I would address some of the things you were saying about whether or not Williams knew or didn't know who Hallam was at the time he went around the business. There's no evidence that he did. There's just, Trout doesn't ever testify that he told him. Williams says in sworn testimony he didn't know. And when you listen to, you know, once he got him down and he cuffed him, he called 911 and said, record all this because he didn't have a recording device. And they recorded it. And you can hear him talking to him. And you can hear him realize, oh, you're the owner. And then he uncuffs him. So that's really clear, makes it very clear that he didn't know until the time after he had taken him down. And then with regard to the third factor, I think the court was correct in the questioning that he's failing to obey commands. And I think that goes to his actively resisting. No, he wasn't resisting arrest at that time because this was a Terry stop, but he's actively resisting. And Williams comes around. He sees violence in the pawn shop, I mean the marijuana shop. Things are broken, strewn around. Whoever did this was violent. He comes around, sees an altercation, and he has to act quickly, swiftly. Like it says, you know, you don't have time to think in the spare of the moment. You can't look at it 20-20 and say, oh, he was the owner later on. You have to look at it right there. And then I'm pretty much out of time. Go back to the reliance on Deputy Williams' statements. There's been raised a problem of credibility based on Deputy Williams' subsequent perjury about having methamphetamine and marijuana in his truck. How does that affect us in terms of assessing whether or not we can rely on his affidavit that he didn't, he didn't know? Well, I don't think that happened anywhere near this time frame, so I don't think it's relevant. It doesn't have to happen near the time frame to affect his credibility in terms of impeachment if this were to go before a jury. Well, I mean, you have the recording of exactly what happened, the video, and then you also have the recording of him talking, knowing. We don't have an audio recording of what was said before between Officers Trout and Officer Williams about who the person in the car was. Well, we have Officer Trout who said he didn't tell him and we have and we have Officer Williams who said, I didn't know. We don't have anybody else's testimony. And then we have the audio afterwards where it's clear that he didn't know until after he had cuffed him. And then at that point, he uncuffed him. That's all I have, other questions. Thank you, counsel. Before we excuse counsel, Mr. Blakemore, could I just ask you a quick question just to button this down? Yes, sir. I take it that you are not appealing the district court's ruling as to the sheriff. No, I'm not. You're waiving any appeal on that. Yes, I was actually somewhat surprised to see Mr. Artis this morning, but. All right. I just want to make sure. Yes, we are not appealing that. Thank you. Thank you. Thank you to all counsel. Appreciate your arguments. Case will be submitted and counsel are excused.